# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

RONALD GOODIN and DEBORAH J.
GOODIN,

      Plaintiffs,

v.                                                    Case No. 3:13-cv-102-J-32JRK

BANK OF AMERICA, N.A.,

      Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

What do you do when your bank repeatedly tries to collect a debt that is not due, you repeatedly try to tell them that they are making a mistake but they just won't listen, and then they file a foreclosure action on your home? Ronald and Deborah Goodin sued, alleging that Bank of America violated the federal Fair Debt Collection Practices Act ("FDCPA") and the related Florida Consumer Collection Practices Act ("FCCPA"). (Doc. 26). The case was tried before the Court on February 11 and 12, 2015 (Doc. 95; Doc. 96), and the parties subsequently submitted proposed findings of fact and conclusions of law (Doc. 100-1; Doc. 101). The case is now ready for decision.[1] Fed. R. Civ. P. 52(a).

_____

[1] The Court conditionally admitted certain evidence at trial subject to further consideration. The findings and conclusions set forth herein do not include any evidence the Court has rejected as irrelevant, unreliable, or otherwise inadmissible.

## I.    FACTS REGARDING LIABILITY

The Goodins took out a $168,743 thirty-year home mortgage from Taylor Bean & Whitaker Mortgage Corp. ("TBW") in November 2006. (Doc. 75 at 12;[2] Joint Ex. 1; Joint Ex. 2). The loan documents provided that the Goodins would be in default if they failed to make two or more consecutive monthly payments. (Doc. 75 at 15). In February 2009, the Goodins filed for Chapter 13 bankruptcy, listing TBW as a creditor. (Id. at 12). Their bankruptcy plan provided that the Goodins would make monthly payments into the bankruptcy court registry and the trustee would use part of those payments to pay their regular mortgage payment and arrears.[3] (Id. at 13). The plan was confirmed in May 2009 and modified in September 2009. (Id. at 13).

While the Goodins were in bankruptcy, TBW was shut down. As a result, on August 26, 2009, Bank of America took over servicing of the Goodins' loan and placed the loan in its bankruptcy department.[4] (Doc. 75 at 13). Plaintiffs were in compliance with their Chapter 13 plan at all times. (Id.). However, as they had not fully paid off the arrears on the mortgage by the time Bank of America took over servicing the loan, their most recent payment at that point had been applied to the amount due in December 2008. (Trial Tr. vol. I at 30).

---

[2] All facts stipulated to in the parties' pre-trial statement were made part of the record at trial. (Trial Tr. vol. I at 5).

[3] Specifically, the Goodins owed regular monthly payments of $1,226.55 and $8,397.53 in arrears. (Pl.'s Ex. 2 at 1).

[4] Normally, Bank of America knows that it will begin servicing a loan sixty to ninety days in advance. (Trial Tr. vol. I at 126). However, because TBW was shut down suddenly, Bank of America took over servicing for roughly 180,000 accounts with essentially no warning. (Trial Tr. vol. I at 126).

For Bank of America's servicing to proceed properly, it needed to file a routine transfer of claim in the bankruptcy court. (Id. at 112). Because it failed to do so, Bank of America did not receive the Goodins' payments, totaling $14,530.28, which instead remained in the bankruptcy court registry. (See Pl.'s Ex. 33). On November 20, 2009, Bank of America informed the Goodins that it had not received mortgage payments for four months and that the Goodins' account would therefore be charged late fees. (Doc. 75 at 14). After the Goodins notified the bankruptcy trustee that Bank of America was not receiving payments (id.), his office sent a letter to Bank of America advising that it must file a transfer of claim to receive the payments (Trial Tr. vol. 1 at 49; Pl.'s Ex. 4 at 1).

A few months after receiving the letter, Bank of America sent three e-mails to its outside counsel, requesting that a transfer of claim be filed and, later, inquiring as to the status of the transfer of claim. (Joint Ex. 6 at 19). On March 8, 2010, Duane Dumler sent an e-mail to outside counsel requesting a transfer of claim be filed for the loan. (Doc. 75 at 13). A week later, Leslie Hodkinson sent a follow-up e-mail asking if the transfer of claim had been filed. (Id.). On May 28, 2010, Hodkinson sent another e-mail, again asking if the transfer of claim had been filed. (Id.).

By that time, the Goodins had already completed their bankruptcy plan on December 8, 2009 and begun making payments directly to Bank of America. (Id. at 14). On July 6, 2010, they were granted a discharge in the bankruptcy case. (Pl.'s Ex. 44). Despite Bank of America's e-mails to outside counsel, the Bank still had not filed

the transfer of claim, so the Goodins' previous payments remained in the court registry. (See Pl.'s Ex. 33).

On October 8, 2010, Bank of America sent a letter to the Goodins telling them their loan was in default and that they may incur fees accordingly. (Pl.'s Ex. 5). The Goodins then attempted to alert Bank of America to the fact that the missing funds were in the court registry. Mr. Goodin went to a branch office to make a payment, but was told that the loan was being handled by the foreclosure department and the Bank employee could not accept his payment. (Trial Tr. vol. II at 77). The Goodins then sent a certified letter to Bank of America's CEO explaining their situation, but never received a response. (Joint Ex. 5; Trial Tr. vol. I at 205). Mr. Goodin called Bank of America twice on October 19, 2010 and again on November 3, 2010. (Joint Ex. 6 at 34-36).

Despite these efforts, on December 3, 2010, Bank of America sent the Goodins a message indicating that their home loan payment was past due. (Pl.'s Ex. 6). Thinking that their calls were a waste of time but unsure of what else they could do, the Goodins continued to attempt to contact Bank of America. (Trial Tr. vol. I at 199). Mr. Goodin called Bank of America on June 6, 2011. (Joint Ex. 6 at 37). That same day, the Goodins submitted an online inquiry, but received a response that their problem would need to be addressed in person or through calling the bankruptcy department. (Id.). Mrs. Goodin then called Bank of America on June 10, 2011 (Id. at 39), Mr. Goodin called twice on September 14, 2011, and then Mrs. Goodin called again on November 9, 2011 (Id. at 40). On each and every call, the Goodins advised Bank of

America that the money was in the bankruptcy court registry and the Bank must file a transfer of claim to receive the necessary funds. (Trial Tr. vol. I at 198). Bank of America did not tell the Goodins that it would file a transfer of claim, but instead only advised them that their account was in the foreclosure department and offered to provide them with a loan history. (Id. at 201).

On December 23, 2011, Jason Juarez, an employee in Bank of America's bankruptcy department, completed a final closing audit of the Goodins' loan. (Id. at 105; Joint Ex. 6 at 23). Bankruptcy department members are trained to perform this eight-step closing audit upon a customer's discharge from bankruptcy: (1) review all disbursements from the bankruptcy trustee to ensure they were received and applied; (2) review the proof of claim; (3) review the manner in which Bank of America applied funds; (4) review escrowed amounts; (5) review fees charged to see if they are still owed or should be reclassified post-discharge; (6) identify missing payments or outstanding balances to determine why they are outstanding; (7) follow up on requests for additional documentation or action; and (8) reconcile all payments and fees. (Trial Tr. vol. I at 134, 136-37). Juarez erred on multiple steps of this protocol, as he should have realized that the Bank had failed to collect the funds from the bankruptcy court registry. (Id. at 138). While a proper review would have led him to send the loan to normal servicing, he instead sent the loan to the foreclosure review department. (Id. at 110).

Four days later, on December 27, 2011, Bank of America sent the Goodins a "Notice of Intent to Accelerate." (Doc. 75 at 14). The notice told the Goodins that they

must pay $15,903.07 by February 10, 2012 or the full amount of the debt would become due and foreclosure proceedings would be initiated. (Pl.'s Ex 16). The next day, Bank of America sent the Goodins a statement indicating that they had failed to make their payments from January 2011 to December 2011, totaling $16,557.32 (Trial Tr. vol. I at 80; Pl.'s Ex. 18 at 1).[5] After the Goodins made a payment which included $49.06 towards the past due amount, Bank of America sent the Goodins a letter on January 13, 2012 stating they owed $16,508.26 and, if they did not pay that amount by February 10, 2012, the Bank may start foreclosure proceedings. (Trial Tr. vol. I at 82; Pl.'s Ex. 19). The Goodins then made another payment of $1,275.61 (Joint Ex. 6 at 5), and on January 17, 2012, the Bank sent correspondence to the Goodins that they owed $15,232.65, and may be subject to foreclosure if they did not pay that amount by February 10, 2012. (Trial Tr. vol. I at 83; Pl.'s Ex. 20). On February 9, 2012, adding a $1,623.51 monthly payment for February and a $49.06 late fee and subtracting the Goodins' $1226.55 payment from that same day, the Bank told the Goodins they needed to pay $15,678.67 to bring their loan current. (Pl.'s Ex. 22).

During the same period, the Goodins received Bank statements misstating the balance owed. On December 27, 2011, the Goodins' statement said their loan "remain[ed] seriously delinquent" with $14,718.60 in past due payments. (Pl.'s Ex. 15).[6] After the Goodins' two January payments, their January 30, 2012 account

---

[5] The difference in totals represents the removal of a $49.06 late fee pursuant to Mr. Juarez's audit (Joint Ex. 6 at 41) and removal of a $703.31 positive partial payment balance (Joint Ex. 6 at 5; Pl.'s Ex. 17),

[6] This amount is less than the amount listed in the notice of intent to accelerate because it referred only to the missed monthly payments, not to late charges.

statement stated that they had $13,492.05 in past due payments. (Trial Tr. vol. I at 84; Pl.'s Ex. 21). The Goodins made a February monthly payment of $1,226.55 (Joint Ex. 6 at 6) rather than the requested $1,623.51 (Pl.'s Ex 21 at 1), and so their February 28, 2012 statement indicated that the Goodins had $13,889.01 past due. (Pl.'s Ex. 24).

By this time, the Goodins had resorted to employing an attorney. On March 22, 2012, Bank of America received a letter from the Goodins' attorney, informing the Bank that there was no need to accelerate the loan, as it only needed to file a notice of transfer of claim in the bankruptcy court to receive the missing funds, which at that time totaled $14,530.28. (Pl.'s Ex. 23 at 1-3). Nevertheless, the Goodins' March 29, 2012 statement showed that they had $14,285.97 past due. (Pl.'s Ex. 26). Bank of America then began refusing the Goodins' checks, returning checks dated April 1, 2012, April 27, 2012, May 30, 2012, July 1, 2012, July 30, 2012, and September 1, 2012. (Doc. 75 at 14). After the September check was returned, the Goodins stopped making payments and saved the money they would have otherwise paid to Bank of America so that they could eventually reinstate the mortgage. (Trial Tr. vol. I at 231).

On September 17, 2012, Bank of America filed a mortgage foreclosure action against the Goodins. (Doc. 75 at 14; Pl.'s Ex. 28). Finally acknowledging that it had made a servicing error, the Bank cancelled a fee related to the foreclosure on December 31, 2012. (Trial Tr. vol. I at 77; Joint Ex. 6 at 61). The Goodins filed this federal lawsuit on January 28, 2013. (Doc. 1). Then, at long last, on February 4, 2013 the Bank filed the transfer of claim and then voluntarily dismissed the foreclosure action on March

---

(Compare Pl.'s Ex. 15 with Pl.'s Ex. 16).

22, 2013. (Doc. 75 at 14). The bankruptcy court granted Bank of America's motion for payment of unclaimed funds in September 2013, and the Bank received $14,530.28 from the court registry. (<u>Id.</u> at 15).

Bank of America applied the funds from the court registry to the loan, and also reduced the Goodins' amount owed by an additional $6,132.75, representing the total of five of the payments the Goodins tried to make that Bank of America rejected. (Trial Tr. vol. I at 157-58; Joint Ex. 4 at 8-9). Nevertheless, because the Goodins had stopped making payments once it became clear that Bank of America would reject any payment, they were at this point actually behind on their mortgage. As such, Bank of America sent the Goodins a series of letters in late October 2013, indicating that they needed to pay $23,179.26 to reinstate the loan. (Pl.'s Ex. 36A, 36B; Joint Ex. 11). Two of these letters included disclaimers stating that the total due may be more or less, depending on a variety of circumstances. (<u>See,</u> <u>e.g.</u>, Pl.'s Ex. 36A at 2-3). The Goodins declined to pay that amount. (Trial Tr. vol. II at 41). Around November 2014, Selene Finance, LP took over servicing of the Goodins' loan. (Pl.'s Ex. 37).

All told, Bank of America sent at least fifteen communications to the Goodins which erroneously claimed amounts due and owing under the Goodins' loan. Meanwhile, the Goodins, their bankruptcy trustee, and their attorney contacted Bank of America no fewer than thirteen times to alert the Bank to its error, all to no avail. It took this federal lawsuit for the Bank to file the transfer of claim and finally dismiss the foreclosure action.

## II. THE COURT'S DECISION ON LIABILITY

### A. Violations

To prove their FDCPA claim, the Goodins must prove that (1) they were the object of collection activity arising from consumer debt; (2) Bank of America is a debt collector as defined by the FDCPA; and (3) Bank of America engaged in an act or omission prohibited by the FDCPA. <u>Kaplan v. Assetcare, Inc.</u>, 88 F. Supp. 2d 1355, 1360–61 (S.D. Fla. 2000) (citation omitted). It is undisputed that this action involves a consumer debt. (Doc. 75 at 15).

Bank of America contends, however, that it is not a debt collector. A mortgage servicing company is a debt collector under the FDCPA if it acquired the loan at issue while the loan was in default. <u>Williams v. Edelman</u>, 408 F. Supp. 2d 1261, 1266 (S.D. Fla. 2005). Under the terms of their note, the Goodins were in default if they missed two or more consecutive payments. (Doc. 75 at 15). When Bank of America took over their loan, the Goodins had previously missed two or more consecutive payments and remained behind by more than two payments. (Trial Tr. vol. I at 30). Nevertheless, Bank of America argues that the Goodins were not in default because their bankruptcy plan cured any pre-existing default and the Goodins never defaulted on any payment due under the bankruptcy plan.[7] (Doc. 101 at 6).

While a bankruptcy plan may "provide for the curing or waiving of any default," this does not mean, as Bank of America argues, that the entry of a bankruptcy plan

_____

[7] Bank of America's argument is ironic given its mishandling of the Goodins' bankruptcy.

itself cures a default. <u>See</u> 11 U.S.C. § 1322(b)(3) (2014). Indeed, the bankruptcy statute also provides that the plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due . . . ." § 1322(b)(5). This provision suggests what is common sense: that the curing of the default occurs upon the repayment of the back payments owed, not upon the mere institution of the bankruptcy plan. <u>See</u> <u>In re Agustin</u>, 451 B.R. 617, 619 (Bankr. S.D. Fla. 2011) ("Using [§] 1322(b)(5), the Debtors are able to cure arrearages over a time period exceeding the life of the Chapter 13 Plan."); <u>see</u> <u>also</u> <u>In re Alexander</u>, 06-30497-LMK, 2007 WL 2296741 (Bankr. N.D. Fla. Apr. 25, 2007) (finding it reasonable to cure a default over the five-year life of the bankruptcy plan). Bank of America is a debt collector.

The Court must now determine whether and when, in connection with the collection of a debt, Bank of America engaged in an act or omission prohibited by the FDCPA. The Goodins assert that Bank of America falsely represented the character, amount, or legal status of a debt, in violation of 15 U.S.C. § 1692e(2)(A), threatened to take an action that cannot legally be taken or that it did not intend to take, in violation of § 1692e(5), and used a false representation or deceptive means to collect or attempt to collect a debt, in violation of § 1692e(10).[8]

---

[8] The Goodins' Third Amended Complaint alleged that Bank of America also falsely represented that nonpayment of a debt would result in the sale of a property where such action would be unlawful, in violation of § 1692e(4), but did not argue a violation of that portion of the statute in its trial brief or proposed findings of fact and conclusion of law. (<u>See</u> Doc. 87 at 6; Doc. 101-1 at 12-13).

The parties devoted little time in their briefs and arguments to discussing which specific acts or omissions by Bank of America qualify as FDCPA violations. But the issue is important because the Court must identify specific violations before it can determine what damages were caused by those violations. Plaintiffs appear to contend that the Bank of America branch employee's refusal of Mr. Goodin's payment, and each of the communications located at Pl.'s Ex. 4-22 and 24-28 and Joint Ex. 11, discussed in detail below, qualify as FDCPA violations. (Doc. 100-1 at 12-13).

To be "in connection with the collection of a debt," a communication need not make an explicit demand for payment. Grden v. Leikin Ingber & Winters PC, 643 F.3d 169, 173 (6th Cir. 2011). However, "an animating purpose of the communication must be to induce payment by the debtor." Id.; see also McIvor v. Credit Control Servs., Inc., 773 F.3d 909, 914 (8th Cir. 2014); cf. Caceres v. McCalla Raymer, LLC, 755 F.3d 1299, 1303 n.2 (11th Cir. 2014) (noting that an implicit demand for payment constituted an initial communication in connection with a debt). Where a communication is clearly informational and does not demand payment or discuss the specifics of an underlying debt, it does not violate the FDCPA. Parker v. Midland Credit Mgmt., Inc., 874 F. Supp. 2d 1353, 1358 (M.D. Fla. 2012).

Some of the communications alleged to be FDCPA violations did not have the animating purpose of inducing the Goodins to pay a debt. Specifically, Bank of America's October 8, 2010 notice that the Goodins may be charged fees while their loan is in default status (Pl.'s Ex. 5), the December 3, 2010 letter alerting the Goodins to the existence of a program to avoid foreclosure despite their "past due" home loan

payment (Pl.'s Ex. 6),[9] the refusal to accept an alleged partial payment (Pl.'s Ex. 17), and the notice that the Goodins' loan had been referred to foreclosure (Pl.'s Ex. 27), did not ask for or encourage payment and were not intended to induce payment. Likewise, the Bank of America branch employee's refusal to accept Mr. Goodin's payment was not an act in connection with the collection of a debt.

A regular bank statement sent only for informational purposes is also not an action in connection with the collection of a debt. See Helman v. Udren Law Offices, P.C., No. 0:14-CV-60808, 2014 WL 7781199, at *6 (S.D. Fla. Dec. 18, 2014). As such, the Goodins' November 10, 2009 account statement, which did not have the purpose of inducing payment from the Goodins, was not an FDCPA violation. (See Pl.'s Ex. 4 at 5).

The letter Bank of America's counsel sent to the Goodins on October 25, 2013 (Joint Ex. 11) was likewise not an FDCPA violation because it did not falsely represent the amount or status of the Goodins' debt, did not threaten an action Bank of America could not or did not intend to take, and did not constitute the use of a false representation or deceptive means in an attempt to collect a debt.

---

[9] In Gburek v. Litton Loan Servicing LP, 614 F.3d 380 (7th Cir. 2010), an offer to discuss repayment options, noting specifically "foreclosure alternatives," was a communication in connection with an attempt to collect a debt. 614 F.3d at 386. However, the letter in Gburek asked for financial information and was the first step in trying to settle or otherwise collect on the defaulted loan. Id. Here, in contrast, the December 3, 2010 letter was intended to inform the Goodins of various rights they may have if they are servicemembers or dependents of servicemembers. (Pl.'s Ex. 6). Bank of America's letter did not request any contact or information from the Goodins. (Pl.'s Ex. 6).

However, Bank of America did violate the FDCPA on multiple occasions, all arising out of the Bank's failure to handle the Goodins' bankruptcy properly despite repeated efforts by the Goodins to rectify the situation. On ten occasions from April 25, 2011 to March 29, 2012, the Bank sent the Goodins statements that contained payment instructions, a payment due date, and an amount due.[10] (Pl.'s Ex. 8, 9, 10, 11, 13, 14, 15, 21, 24, 26). Each of the statements misstated the balance of the loan, falsely representing the amount of the debt in connection with collection activity, in violation of the FDCPA. As part of similar statements, Bank of America violated the FDCPA when it falsely represented in March 2011 and August 2011 that the Goodins owed foreclosure fees on the debt. (Pl.'s Ex. 7, 12).

Bank of America also violated the FDCPA in connection with a number of letters it sent seeking allegedly overdue payments. The Bank's Notice of Intent to Accelerate, dated December 27, 2011, requested payment of $15,903.07, which falsely represented the amount of the debt owed. (Pl.'s Ex. 16). As such, that letter, as well as the follow-up letters on January 13, 2012 (Pl.'s Ex. 19), January 17, 2012 (Pl.'s Ex. 20), February 9, 2012 (Pl.'s Ex. 22), and March 16, 2012 (Pl.'s Ex. 25), each of which represented the Goodins must pay over $15,000 by February 10, 2012, constitute FDCPA violations. While not expressly related to the Notice of Intent to Accelerate, Bank of America's

---

[10] The statements were labeled "FOR INFORMATION PURPOSES" and stated that, if the Goodins were currently debtors in bankruptcy (which they were not), the letter "should not be construed as an attempt to collect against [them] personally." (See, e.g., Pl.'s Ex. 8). While these characteristics in some respects align the statements with those in Helman, 2014 WL 7781199, at *6, the addition of payment instructions, due dates, and an amount owed differentiate the letters in this case and demonstrate that the statements had the animating purpose of collecting on the debt.

December 28, 2011 notice to the Goodins seeking $16,557.32 also constituted debt collection activity and falsely represented the amount of the debt in violation of the FDCPA. (Pl.'s Ex. 18).

The lone remaining alleged violation is Bank of America's filing of a foreclosure complaint against the Goodins. (Pl.'s Ex. 28). Foreclosing on a home is the enforcement of a security interest, not debt collection. Warren v. Countrywide Home Loans, Inc., 342 F. App'x 458, 461 (11th Cir. 2009). However, a deficiency action does constitute debt collection activity. Baggett v. Law Offices of Daniel C. Consuegra, P.L., No. 3:14-CV-1014-J-32PDB, 2015 WL 1707479, at *5 (M.D. Fla. Apr. 15, 2015). Communication that attempts to enforce a security interest may also be an attempt to collect the underlying debt. Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1217-18 (11th Cir. 2012).

When a foreclosure complaint seeks a deficiency judgment if applicable, it attempts to collect on the security interest and the note. Roban v. Marinosci Law Grp., No. 14-60296-CIV, 2014 WL 3738628 (S.D. Fla. July 29, 2014). As such, two cases have found that foreclosure complaints that ask for a deficiency judgment "if applicable" constitute debt collection activity under the FDCPA. See id.; Rotenberg v. MLG, P.A., No. 13-CV-22624-UU, 2013 WL 5664886, at *2 (S.D. Fla. Oct. 17, 2013). Similarly, a foreclosure complaint constitutes debt collection activity where it requests "that the court retain jurisdiction to enter a deficiency decree, if necessary." Freire v. Aldridge Connors, LLP, 994 F. Supp. 2d 1284, 1288 (S.D. Fla. 2014).

Bank of America's foreclosure complaint falsely stated that the Goodins owed $159,298.08 on the principal of their note and mortgage, plus interest and fees. (Pl.'s Ex. 28 at 2). The complaint asked for the Goodins' property to be sold only if the Goodins failed "to pay the amount of money found to be due by them" and, just like the foreclosure complaint in Freire, asked the court to retain jurisdiction to enter a deficiency judgment if the proceeds of the sale were insufficient. (Id. at 2, 3). As the foreclosure complaint sought to collect on the note and the security interest, it constituted debt collection activity and a violation of the FDCPA.

The Goodins contend that every violation of the FDCPA also constitutes a violation of the FCCPA, which prohibits any person, in collecting consumer debts, from claiming, attempting, or threatening to enforce a debt when that person knows the debt is not legitimate, or from asserting the existence of any other legal right with the knowledge that the right does not exist. Fla. Stat. § 559.72(9) (2014). Each of Bank of America's FDCPA violations involved the collection of a consumer debt and an attempt to enforce a debt greater than the amount actually owed. Moreover, Bank of America knew at least as early as March 2010 that it needed to claim funds from the bankruptcy registry and that the amount the Goodins owed on the loan should be reduced accordingly. (Doc. 75 at 13). As such, the Bank knew it was seeking to enforce a debt greater than that actually owed. Each of the FDCPA violations was therefore also an FCCPA violation.

The Court, as fact-finder, finds that the Goodins have proven these FDCPA and FCCPA violations by a preponderance of the evidence.

**B.    The Statute of Limitations**

Bank of America argues that the statute of limitations bars the Goodins from recovering for any FDCPA violation before January 28, 2012.[11] (Doc. 102 at 4). Bank of America did not plead a statute of limitations defense and did not argue it at trial, but moved, on the day the parties' proposed findings of fact and conclusions of law were due, to "[a]mend the [p]leadings to [c]onform to the [e]vidence to add the applicable statute of limitations defense." (Id. at 1).

Bank of America says it failed to raise a statute of limitations defense earlier because the Third Amended Complaint did not allege that the failure to file a transfer of claim was an FCCPA or FDCPA violation. (Id. at 4). But the Goodins agree that the failure to file a transfer of claim was not itself a statutory violation. (Doc. 103 at 4). Accordingly, Bank of America's offered reason for amending the pleadings to conform to the evidence is meritless. Bank of America never raised a statute of limitations defense before or during trial. As it waived that defense, the Court need not consider it further. Kelly v. Balboa Ins. Co., 897 F. Supp. 2d 1262, 1269 (M.D. Fla. 2012).

**C.    The Bona Fide Error Defense**

Bank of America also asserts that it is entitled to a "bona fide error" defense regardless of any FDCPA or FCCPA violations. The bona fide error defense has three elements, each of which Bank of America must prove by a preponderance of the evidence. First, the Bank must show that its errors were not intentional. 15 U.S.C. §

---

[11] Bank of America also argues the Goodins are barred from recovering for FCCPA violations prior to January 28, 2011. (Doc. 101 at 5). As the Court finds no violations prior to January 28, 2011, the issue is moot.

1692k(c); Fla. Stat. § 559.77(3). Second, the Bank must show that its errors were bona fide. Id. An error is bona fide only where it was made in good faith and was objectively reasonable. Edwards v. Niagara Credit Solutions, Inc., 584 F.3d 1350, 1354 (11th Cir. 2009).

Third, the Bank must show that the errors occurred despite the maintenance of procedures reasonably adapted to avoid any such errors. 15 U.S.C. § 1692k(c); Fla. Stat. § 559.77(3). To do so, the Bank must show that it actually employed procedures, and that those procedures were reasonably adapted to avoid the specific errors at issue. Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1274 (11th Cir. 2011). In other words, the errors must have occurred despite regular processes that are mechanical or otherwise orderly in nature. See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 587 (2010). This third element is "a uniquely fact-bound inquiry susceptible of few broad, generally applicable rules of law." Owen, 629 F.3d at 1277.

Bank of America contends that its eight-step bankruptcy closing audit, negligently performed by Mr. Juarez on December 23, 2011, constitutes a procedure reasonably adapted to avoid the errors in this case.[12] (Doc. 101 at 6-7). Such a

---

[12] It appears Bank of America also contends that its anemic attempts to have a transfer of claim filed qualified as a procedure reasonably adapted to avoid the Bank's errors. (Doc. 101 at 6). The Bank only presented evidence that it sent a few e-mails to its lawyers about the transfer of claim, with no further follow-up to see if the transfer was actually filed. The Bank did not demonstrate that it had a regular, orderly process to ensure that it filed a transfer of claim. As such, the Bank failed to show that it actually employed procedures related to the transfer of claim. Cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 587 (2010). Moreover, even if the e-mails did constitute a procedure, the subsequent misrepresentations regarding the amount of the Goodins' debt were not reasonable errors in the face of the Goodins' repeated efforts to notify the Bank that it needed to file a transfer of claim.

procedure was not reasonably adapted to avoid the multitude of violations that occurred before the audit. As to the violations that occurred subsequent to the audit, there was no evidence of any procedure to respond appropriately to complaints, including the letter from the Goodins' attorney that the Bank received after the audit. In any event, the Court need not decide whether the audit was a procedure reasonably adapted to avoid those errors because, on the facts of this case, the Bank's errors were not objectively reasonable, and therefore fail the second element of the defense.

By the time Mr. Juarez negligently conducted the closing audit, the Goodins and the bankruptcy trustee had already contacted Bank of America at least twelve times, each time informing the Bank that the Goodins were not behind on their payments and that the Bank simply needed to file a transfer of claim to obtain the missing funds. The Goodins had called the Bank, submitted online inquiries, mailed a certified letter to the Bank's CEO, and shown up in person at a Bank branch to discuss the issue. Yet, the Bank had insufficient procedures to respond to these complaints and correct the problem.

When asked what procedures Bank of America has for reviewing complaints and inquiries regarding servicing errors, the Bank's bankruptcy department mortgage servicing unit manager, Michael Foster, could provide little information. Foster, the only witness put forward by Bank of America to describe its loan servicing procedures, testified as follows: "What's your procedure for responding to or investigating customer complaints or letters from lawyers that explain what's going on with the customer and asking you to correct it?" (Trial Tr. vol. I at 150). Mr. Foster responded, "It would be a

separate procedure from the one that I discussed (involving the closing audit). And, unfortunately, I'm not familiar with that procedure." (Id.). He was later asked, "So when – whoever in your group read the letter [from the Goodins' attorney] in which it was disclosed that there was 14,000 of money ready for [the Bank] to pick up if Bank of America would do the paperwork, what would your procedures tell you to do at that time." (Id. at 173). Mr. Foster responded, "I'm unfamiliar with that specific procedure." (Id.). Mr. Foster also did not know who would have received the complaints and been responsible for dealing with them in this particular case. (Id. at 172-73). The only evidence that Bank of America responded to any of the Goodins' communications are the three e-mails the Bank sent outside counsel in 2010 requesting the filing of a transfer of claim. (Id. at 155). Subsequent to those e-mails, the Goodins contacted the Bank at least ten times to try to fix the problem, but none of those communications made any impact until the Goodins filed this suit.

At least two people in the Bank, Duane Dumler and Leslie Hodkinson, knew long before Mr. Juarez's error that the Bank needed to file a transfer of claim to obtain the missing funds. Either because of the Bank's size, because its departments were compartmentalized and did not properly communicate with each other, or some other reason, this knowledge did not make its way to the foreclosure department or to the part of the Bank responsible for sending out the communications that violated the FDCPA. Then, after Mr. Juarez's negligent audit, the Goodins' attorney contacted Bank of America to fix the problem, but the Bank still proceeded to misrepresent the amount the Goodins owed and ultimately filed a foreclosure complaint, only

dismissing the foreclosure action after the Goodins literally had to make a federal case out of it.

In light of the Bank's failure to have appropriate procedures in place to ensure that a transfer of claim is filed and respond to attempts to correct its servicing, and its failure to communicate internally about its knowledge that it needed to file a transfer of claim to obtain the funds, the Court finds as a fact that the Bank's errors were not objectively reasonable. As such, the Bank has not carried its burden of proving its errors were bona fide.

## III.    FACTS REGARDING DAMAGES

Since Bank of America began servicing the Goodins' loan, Mrs. Goodin has felt anxious every day, worrying about the status of her loan. (Id. at 239-40). At times, she has lost sleep because of her concern about the loan. (Id. at 240). However, she never went to a doctor for treatment, in part because she did not have insurance to do so and in part because she did not believe a doctor would make a difference. (Id. at 241).

Mr. Goodin likewise suffered anxiety and sleeplessness as a result of Bank of America's improper servicing. (Trial Tr. vol. II at 105). Mr. Goodin was immensely frustrated by Bank of America's lack of responsiveness to his attempts to fix the problems with his loan. (Id. at 74). He sent letters, talked to a Bank of America employee face-to-face, and tried everything that he could think of, but could not find a way to get Bank of America to file the transfer of claim or correct its servicing of the Goodins' loan. (Id. at 74). While Mr. Goodin's description of his life as "a pure living hell" is perhaps hyperbolic, it is clear that Bank of America's letters and Mr. Goodin's

inability to correct the problem made him feel powerless and caused him considerable anger and distress. (See id. at 74, 86).

Most of the Goodins' testimony dealt generally with emotional distress they suffered throughout the Bank's servicing of their loan. However, Mrs. Goodin was especially concerned when the Goodins' bankruptcy was discharged because Bank of America was not getting their payments and she knew that, absent payment, Bank of America would take legal action against them. (Id. at 18). The Goodins noted that they also suffered particular stress upon being served with the foreclosure complaint. (Id. at 79). The possibility of losing their home to foreclosure upset Mr. Goodin and left Mrs. Goodin worried and scared. (Id. at 79).

Bank of America was not the only cause of stress in the Goodins' lives. Mrs. Goodin was under stress before they filed for bankruptcy because the Goodins were having trouble paying their bills. (Id. at 13). She also suffered the loss of her mother around 2011. (Id. at 69). In June 2013, the Goodins sued TRS Recovery Services, Bennett Law, PLLC, and Wal-Mart (Id. at 22), alleging that they were the victims of check fraud in September 2011 (Id. at 24). Because of the wrongful debt incurred by the fraud, TRS sent the Goodins collection letters from October 2011 through November 2012 and called frequently from October 2011 until July 2012. (Id. at 24-25). As a result, the Goodins lost sleep, felt anxious, and suffered other symptoms of emotional distress. (Id. at 26). However, the Goodins testified credibly that the stress, anxiety, and sleeplessness caused by the events underlying the TRS lawsuit pale in

comparison to the emotional distress the Goodins suffered as a result of Bank of America's actions. (Id. at 64, 106).

While not accepting every aspect of their testimony, overall, the Court found the Goodins' testimony regarding the emotional distress caused by the Bank's FDCPA and FCCPA violations to be believable. The tumult of receiving repeated erroneous communications from the Bank, their inability to get anybody at the Bank to listen to them, their feelings of loss of control and the very real fear of losing their home combined to create a very stressful situation.

## IV. THE COURT'S DECISION ON DAMAGES

### A. Statutory Damages

Under both the FDCPA and FCCPA, prevailing plaintiffs are entitled to statutory damages of up to $1,000. 15 U.S.C. §1692k; Fla. Stat. § 559.77. In determining the appropriate amount, the Court must consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional . . . ." 15 U.S.C. §1692k; see also Fla. Stat. § 559.77(2). Upon consideration of the Bank's repeated statutory violations and inability to correct the problems with the Goodins' loans despite a plethora of chances to do so, the Court finds Mr. and Mrs. Goodin are each entitled to $1,000 under the FDCPA and $1,000 under the FCCPA.

### B. Actual Damages

The Goodins also each seek $500,000 in actual damages to compensate for their emotional distress. (Doc. 100-1 at 17). A plaintiff may recover actual damages for

emotional distress under the FDCPA and FCCPA. <u>Minnifield v. Johnson & Freedman, LLC</u>, 448 F. App'x 914, 916 (11th Cir. 2011) (finding that a plaintiff can recover for emotional distress under the FDCPA); <u>Fini v. Dish Network L.L.C.</u>, 955 F. Supp. 2d 1288, 1299 (M.D. Fla. 2013) (finding the same under the FCCPA).

In determining what actual damages are appropriate in this case, the Court has only considered those damages caused by the Bank's FDCPA and FCCPA violations, and not any distress caused by other aspects of the Bank's improper servicing of the Goodins' account. To recap, Bank of America violated the FDCPA when it (1) mailed ten statements from April 25, 2011 to March 29, 2012, indicating, amongst other misstatements, an overstated balance on the loan; (2) mailed statements in March and August 2011 misstating that the Goodins owed foreclosure fees; (3) sent the Goodins six letters between December 27, 2011 and March 16, 2012 requesting over $15,000 in payments and threatening to accelerate the debt or foreclose in the absence of payment; and (4) filed a foreclosure complaint on September 17, 2012. Any emotional distress the Goodins suffered as a result of the Bank's violations therefore occurred between March 2011, the date of the first violation, and October 2013, when the Bank finally corrected its servicing errors.

"Emotional distress must have a severe impact on the sufferer to justify an award of actual damages." <u>Alecca v. AMG Managing Partners, LLC</u>, No. 3:13-CV-163-J-39PDB, 2014 WL 2987702, at *2 (M.D. Fla. July 2, 2014). As such, a number of courts have declined to award damages for emotional distress where the plaintiff's testimony was not supported by medical bills. <u>See, e.g.</u>, <u>Lane v. Accredited Collection Agency</u>

<u>Inc.</u>, No. 6:13-CV-530-ORL-18, 2014 WL 1685677, at *8 (M.D. Fla. Apr. 28, 2014) (adopting a report and recommendation recommending no actual damages despite testimony that the plaintiff suffered nervousness, anxiety, and sleeplessness); <u>compare</u> <u>Marchman v. Credit Solutions Corp.</u>, No. 6:010-CV-226-ORL-31, 2011 WL 1560647, at *10 (M.D. Fla. Apr. 5, 2011) <u>report and recommendation adopted,</u> No. 6:10-CV-226-ORL-31, 2011 WL 1557853 (M.D. Fla. Apr. 25, 2011) (awarding no actual damages where the plaintiff testified that she spent nights awake with worry and was withdrawn and depressed but did not provide evidence she required medical or professional services) <u>with</u> <u>Latimore v. Gateway Retrieval, LLC</u>, No. 1:12-CV-00286-TWT, 2013 WL 791258, at *10-11 (N.D. Ga. Feb. 1, 2013) <u>report and recommendation adopted,</u> No. 1:12-CV-286-TWT, 2013 WL 791308 (N.D. Ga. Mar. 4, 2013) (awarding $10,000 in emotional distress damages where the plaintiff submitted medical bills to support her testimony). Indeed, both courts and juries have rejected claims for emotional distress in cases involving serious FDCPA violations. <u>See</u> <u>Montgomery v. Florida First Fin. Grp., Inc.</u>, No. 6:06-CV-1639ORL31KR, 2008 WL 3540374, at *9 (M.D. Fla. Aug. 12, 2008) (adopting a Report and Recommendation recommending no actual damages despite the defendant threatening six times, to plaintiff, plaintiff's daughter, and plaintiff's mother, that it would have plaintiff arrested, and despite plaintiff's testimony she was scared and struggled to sleep for fear that she would be arrested); <u>Jordan v. Collection Services, Inc.</u>, Case No. 97-600-CA-01, 2001 WL 959031 (Fla. 1st Cir. Ct. April 5, 2001) (jury awarded no damages despite defendant's debt

collection calls that threatened, amongst other consequences, that a hospital would refuse to admit plaintiffs' ill child if they did not pay their debt).

Still, other courts have awarded actual damages for emotional distress for FDCPA and FCCPA violations, albeit usually in relatively small amounts. For example, in <u>Barker v. Tomlinson</u>, No. 8:05-CV-1390-T-27EAJ, 2006 WL 1679645 (M.D. Fla. June 7, 2006), the plaintiff received $10,000 in actual damages where the defendant called her at work to demand payment for an illegitimate debt, threatened her with arrest if she did not pay, and faxed a request for an arrest warrant to her workplace. <u>Barker</u>, at *3. Similarly, where the plaintiff suffered three panic attacks after the defendant threatened that she could go to jail, threatened to send a deputy to her house, and told her daughter that her mom would be arrested, the court awarded $1,000 in actual damages. <u>Rodriguez v. Florida First Fin. Grp., Inc.</u>, No. 606CV-1678-ORL-28DAB, 2009 WL 535980, at *6 (M.D. Fla. Mar. 3, 2009).

There are two notable exceptions to the small damages awards usually given in FDCPA cases. In <u>Mesa v. Insta-Service Air Conditioning Corp.</u>, Case No. 03-20421 CA 11, 2011 WL 5395524 (Fla. 11th Cir. Ct. Aug. 2, 2011), a jury awarded $150,000 in compensatory damages where an air conditioning company defrauded the plaintiff into buying a defective air conditioner and, unbeknownst to the plaintiff, took out a line of credit in his name. However, it is unclear what amount of those compensatory damages were based on emotional distress and what amount were economic damages. In <u>Beasley v. Anderson, Randolf, Price LLC</u>, Case No. 16-2007-CA-005308, 2010 WL 6708036 (Fla. 4th Cir. Ct. April 19, 2010), a jury awarded $75,000 for mental anguish,

inconvenience, or loss of capacity for the enjoyment of life after the defendant repeatedly called the plaintiff's cell phone to collect a debt, even after being told that it was a work phone number, after receiving a cease and desist letter, and after learning the plaintiff was represented by an attorney.

While not precisely on point, there are two FDCPA cases that represent somewhat similar facts to this case.[13] In <u>Campbell v. Bradley Fin. Grp.</u>, No. CIV.A. 13-604-CG-N, 2014 WL 3350054 (S.D. Ala. July 9, 2014), the defendant repeatedly called the plaintiff, wrongfully alleging that she owed a debt, that she would be sued, and that her wages would be garnished if she did not pay. <u>Campbell</u>, at *4. The plaintiff tried to explain that she had already paid the debt but, because the defendant insisted, she paid the illegitimate debt. <u>Id.</u> Based on the plaintiff's testimony of her fear of legal action being taken against her, the threatening nature of the phone calls, and the fact that the plaintiff paid the illegitimate debt, the court awarded $15,000 in emotional distress damages. <u>Id.</u>

Similarly, in <u>Gibson v. Rosenthal, Stein, & Associates, LLC</u>, No. 1:12-CV-2990-WSD, 2014 WL 2738611 (N.D. Ga. June 17, 2014), the defendant called the plaintiff

---

[13] To the extent the Goodins contend that wrongful foreclosure actions are a more apt analogy, the Court finds this argument unpersuasive. Moreover, the most similar cases outside the FDCPA are in line with the Court's award in this case. <u>See Tworoger & Sader v. First Union Nat'l. Bank of Florida</u>, Case No. 85-15265 CJ, 1988 WL 369080 (Fla. Cir. Ct. May 1988) (awarding $35,000 in a malicious prosecution and abuse of process case where the defendant initiated a foreclosure action against the plaintiff and refused the plaintiff's payment for the arrears); <u>Bullard v. W. Star Fin. Corp.</u>, JVR No. 189990 (Ga. Super. Nov. 1996) (awarding $100,000 in compensatory damages where the defendant thrice initiated wrongful foreclosure proceedings against the plaintiff's property, causing the plaintiff to pay the requested amount on the first two occasions).

and alleged that she owed a debt that she did not owe. <u>Gibson</u>, at *2. The defendant threatened to call the sheriff and have the plaintiff arrested if she did not make a payment. <u>Id.</u> Afraid of going to jail, the plaintiff paid the illegitimate debt using money she needed for living expenses, causing her to go without electricity for two weeks and without water. <u>Id.</u> The court therefore awarded her $15,000. <u>Id.</u>

While these cases are useful as guidance, ultimately, the Court as fact-finder must determine the appropriate amount of damages based on the evidence in this case. Emotional distress damages are particularly difficult to quantify. For example, the Eleventh Circuit pattern jury instructions for emotional distress damages in employment actions contain this language: "You will determine what amount fairly compensates [him/her] for [his/her] claim. There is no exact standard to apply, but the award should be fair in light of the evidence." Eleventh Circuit Pattern Jury Instructions (Civil) Adverse Employment Action Claims Instructions 4,1, 4.2, 4.3, 4.4, 4.5, 4.9 (2013 Edition).

The Goodins suffered prolonged (over two and a half years) stress, anxiety, and sleeplessness as a result of Bank of America's misrepresentations regarding the amount of the debt the Goodins owed. This emotional distress reached its peak when the Bank repeatedly threatened the Goodins that, if they did not pay in excess of $15,000, the Goodins' debt would be accelerated and the Goodins could face foreclosure. The Bank then filed the foreclosure action, and did not dismiss it until six months later (and only after the Goodins were forced to file this lawsuit). While the Goodins did not present evidence from an expert or doctor and in fact did not seek

medical attention for their emotional distress, the Court found credible their testimony that they suffered real and severe emotional distress. See supra Part III. Mr. Goodin had worked all his life (Trial Tr. vol. II at 72), but the family was forced into bankruptcy by a poor business investment (Id. at 119). Nevertheless, the Goodins remained ready to continue paying on their mortgage, even while in bankruptcy, but for Bank of America's gross negligence. While they had other causes of stress as well, their fear of losing their home and feeling of helplessness in the face of Bank of America's indifference was far and away the primary cause of stress in their lives. Given the facts of this case and the duration of the Goodins' emotional distress, the Court finds the Goodins are entitled to a larger award than in the mine-run FDCPA case (but nowhere near their request of $500,000 each). Accordingly, the Court, as fact-finder, finds that Mr. and Mrs. Goodin have proven entitlement to $50,000 each for their emotional distress.

### C.    Punitive Damages

In addition to statutory and actual damages, the Goodins request ten million dollars in punitive damages under the FCCPA.[14] (Doc. 100-1 at 21). The Court may award punitive damages under the FCCPA. Fla. Stat. § 559.77. The Goodins argue that punitive damages are appropriate where the defendant acted with malicious intent, meaning that it did a wrongful act "to inflict injury or without a reasonable cause or excuse." (Doc. 100-1 at 18) (quoting Story v. J. M. Fields, Inc., 343 So. 2d 675,

---

[14] The Goodins also request equitable relief, which the Court does not find warranted.

677 (Fla. Dist. Ct. App. 1977). Bank of America likewise cites this standard (Doc. 101 at 16), as have a number of courts that considered punitive damages under the FCCPA, see, e.g., Crespo v. Brachfeld Law Grp., No. 11-60569-CIV, 2011 WL 4527804, at *6 (S.D. Fla. Sept. 28, 2011); but see Alecca, 2014 WL 2987702, at *1 (finding unpersuasive the plaintiff's argument that behavior that had no excuse was equated with malicious intent).

As Bank of America points out, however, Fla. Stat. § 768.72 was amended in 1999, subsequent to the decision in Story, to provide a new standard for punitive damages. Now, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). Punitive damages may be imposed on a corporation for conduct of an employee only if an employee was personally guilty of intentional misconduct or gross negligence and (1) the corporation actively and knowingly participated in that conduct; (2) the officers, directors, or managers of the corporation knowingly condoned, ratified, or consented to the conduct; or (3) the corporation engaged in conduct that constituted gross negligence and that contributed to the loss suffered by the claimant. § 768.72(3). "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a). "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a

conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b). Barring the application of certain exceptions not present here, any punitive damages award is limited to the greater of: "Three times the amount of compensatory damages awarded to each claimant entitled thereto" or $500,000. § 768.73(1).

Those cases that have applied the Story standard subsequent to the amendment to § 768.72 have not addressed § 768.72. See, e.g., Montgomery, 2008 WL 3540374, at *10. The Goodins contend that the punitive damages provisions of § 768.72 et seq. do not apply to this case because those provisions are in the "Torts" section of the Florida code rather than the "Consumer Collection Practices" section where the FCCPA is. However, the punitive damages section applies to "any action for damages, whether in tort or in contract." Fla. Stat. § 768.71. Thus, the Eleventh Circuit has assumed that the punitive damages cap in Fla. Stat. § 768.73(1)(a) applies to FCCPA cases. McDaniel v. Fifth Third Bank, 568 F. App'x 729, 732 (11th Cir. 2014). A number of other courts have also assumed that the procedural requirements in § 768.72 would apply to FCCPA actions if they did not conflict with the Federal Rules of Civil Procedure. See, e.g., Brook v. Suncoast Sch., FCU, No. 8:12-CV-01428-T-33, 2012 WL 6059199, at *5 (M.D. Fla. Dec. 6, 2012).[15] As such, the Court will apply the punitive damages standard dictated by the statute. Cf. City of St. Petersburg v. Total

---

[15] Indeed, the punitive damages provisions are plainly applicable to other causes of action arising outside of the "Torts" title because Fla. Stat. § 400.023, in the "Public Health" title of the Florida code, required an express exemption from coverage under § 768.72(2)-(4). Fla. Stat. § 768.735(1).

*Containment, Inc.*, No. 06-20953-CIV, 2008 WL 5428179, at *25-26 (S.D. Fla. Oct. 10, 2008) report and recommendation adopted in part, overruled in part sub nom. *City of St. Petersburg v. Dayco Products, Inc.*, No. 06-20953, 2008 WL 5428172 (S.D. Fla. Dec. 30, 2008) (applying § 768.72's provisions instead of the common law standard laid out in *White Const. Co. v. Dupont*, 455 So. 2d 1026, 1028-29 (Fla. 1984)).

As well documented in earlier sections of these findings, the Bank employees were inattentive, unconcerned, and haphazard in their repeated and prolonged mishandling of the Goodins' loan. Then, the auditor whose very job it is to correct errors, was himself negligent in his review of the Goodins' file. If that was the sum of Bank of America's actions, it would be guilty of negligence many times over, but perhaps not gross negligence.

It is the Bank's employees' failure to respond to the Goodins' many efforts to correct the Bank's errors that sets this case apart. Bank of America received numerous communications from the Goodins and their attorney explaining the problems with the Bank's servicing. (Joint Ex. 5 at 2; Joint Ex. 6 at 37, 39, 40; Pl.'s Ex. 23). Yet, beyond noting that the communications were received, the Bank employees did nothing to correct the servicing errors. With their home at stake, the Goodins might as well have been talking to a brick wall.

In taking no action to prevent the errors from continuing, even after being repeatedly notified of them, the Bank employees' conduct was so wanting in care that it constituted a conscious disregard and indifference to the Goodins' rights. It was as if the Goodins did not exist. Because the Bank's employees disregarded the Goodins'

complaints, the servicing errors continued unabated, the Bank continued to send the Goodins false information about the amount of their debt, and then the Bank filed a misbegotten foreclosure action. The Bank employees' continued gross negligence was only stopped by the filing of this federal lawsuit.

Moreover, in creating a system where one Bank department did not communicate with another, where there were inadequate internal controls to ensure statements provided correct information, and where there was no way for Bank customers to get the attention of the Bank to correct the Bank's errors, the Bank engaged in grossly negligent conduct. As such, it should be held liable for punitive damages for its employees' gross negligence.

In justifying their request for $10 million in punitive damages, the Goodins cite to only one case they believe to be similar, Toddie v. GMAC Mortgage LLC, No. 4:08-cv-00002, 2009 WL 3842352 (M.D. Ga. March 26, 2009), where the Court awarded $2,000,0001 in punitive damages and $570,000 in compensatory damages. (Doc. 100-1 at 19-20). Toddie, however, was a wrongful foreclosure and breach of contract case, not an FCCPA case, and involved much more egregious facts, as the defendant actually foreclosed on the plaintiff's home.

Where courts have awarded punitive damages in FCCPA cases, the amounts have typically been small. See Rodriguez, 2009 WL 535980, at *6 (awarding $2,500 in punitive damages); Montgomery, 2008 WL 3540374, at *11 (awarding $1,000 in punitive damages); Barker, 2006 WL 1679645, at *3 (awarding $10,000 in punitive

damages).[16] However, this case presents a different situation, one of a very large corporation's institutional gross negligence.

The goal of punitive damages is to punish gross negligence and to deter such future misconduct. Thus, the award must be large enough to get Bank of America's attention, otherwise these cases become an acceptable "cost of doing business." Bank of America is a huge company with tremendous resources, a factor that the Court may and has considered in determining an appropriate award. See Myers v. Cent. Florida Investments, Inc., 592 F.3d 1201, 1216 (11th Cir. 2010).[17] Also, this is a serious FCCPA case, in which there were a large number of violations that occurred over a long period of time, and in which the Bank ignored the Goodins' repeated attempts to fix its many errors. The Court, as fact-finder, finds that the Goodins have proven by clear and convincing evidence that a punitive damages award of $100,000 is appropriate.[18]

Accordingly, it is hereby

**ORDERED:**

1.    Bank of America's Motion to Amend Pleadings (Doc. 102) is **DENIED**.

---

[16] For a more fulsome discussion of these cases, see supra Part IV.B.

[17] The Goodins presented evidence that Bank of America has total equity capital of over $202 billion. (Pl.'s Ex. 50B). While opposing any punitive damages award, Bank of America conceded that it would be readily able to pay any punitive damages award that did not violate the Florida statutory cap on punitive damages. (Trial Tr. vol. II at 132).

[18] Given the Bank's large net worth, the Court considered an even higher punitive award. However, in light of the precedents and that the Court has found the Bank was grossly negligent but did not engage in intentional misconduct, a punitive award that mirrors the compensatory award is appropriate.

2.    The Court intends to enter judgment in favor of Plaintiffs Ronald and Deborah Goodin and against Bank of America in the amount of $204,000 once attorneys' fees have been decided. The Goodins have until **July 15, 2015** to file a motion for attorneys' fees and costs, and Bank of America has until **August 10, 2015** to respond.

**DONE AND ORDERED** in Jacksonville, Florida the 23rd day of June, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

w.
Copies:

Counsel of record